# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| C.B., *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 8:18-cv-01780-PX |
| Smith, *et al.*, | * | |
| Defendants. | * | |

## MEMORANDUM OPINION

Pending in this Individuals with Disabilities Education Act ("IDEA") case are the parties' cross-motions for summary judgment, disputing whether the parents are entitled to reimbursement for their unilateral placement of C.B. in a private school. ECF Nos. 17–18. C.B., and his parents, E.B. and P.B., appeal the decision rendered in *C.B. v. Montgomery County Public Schools*, OAH No. MSDE-MONT-OT-07-22806, issued February 15, 2018 by Louis N. Hurwitz, an Administrative Law Judge of the Maryland Office of Administrative Hearings. The matter has been fully briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, C.B.'s motion for summary judgment is denied (ECF No. 17) and Jack R. Smith and Montgomery County Board of Education (collectively, "MCPS")'s motion for summary judgment is granted. ECF No. 18.

### I. Background

#### A. The Individuals with Disabilities Education Act ("IDEA")

This matter comes before this Court pursuant to the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1412(a)(1)(A). IDEA mandates that all children identified with a covered disability be given a free appropriate public education, or "FAPE." A FAPE must provide to disabled children "meaningful access to the educational process" in "the

least restrictive environment" that is "reasonably calculated to confer 'some educational benefit.'" *E.S. v. Smith*, No. PWG-17-3031, 2018 WL 3533548, at *2 (D. Md. July 23, 2018) (citing *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 207 (1982)). Although "the benefit conferred . . . must amount to more than trivial progress" in a child's education, the IDEA "does not require that a school district provide a disabled child with the best possible education." *Id.* (citing *Rowley*, 458 U.S. at 192; *Reusch v. Fountain*, 872 F. Supp. 1421, 1425 (D. Md. 1994)). Rather, a school must prepare and implement an individualized education plan ("IEP") that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) ("Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal.").

The IEP addresses the student's current educational status, annual educational goals, the need for special educational services or other aids necessary to help meet those goals, and whether the child may be educated in an inclusive school classroom with non-disabled students. *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014) (citing 20 U.S.C. § 1414(d)(1)(A)); *see also J.R. v. Smith*, No. DKC 16-1633, 2017 WL 3592453, at *1 (D. Md. Aug. 21, 2017). Parents play a critical role in the IEP process. Parents are afforded the opportunity to participate in the creation of the IEP, the annual IEP review, and any subsequent meetings to modify the IEP. *See* 20 U.S.C. §§ 1414(d)(1)(B)–1415(f); *see also M.M. ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 527 (4th Cir. 2002). Once an IEP is finalized, parents may accept or reject it. If parents reject the IEP as failing to provide a FAPE, they may pursue administrative remedies before an Administrative Law Judge ("ALJ") at a Due Process

hearing. In the interim, parents may pay for services, to include placement in a private school, and seek reimbursement from the School District. *E.S.*, 2018 WL 3533548, at *2 (quoting 20 U.S.C. § 1412(a)(1)(C)(iii) and *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70 (1985)). Either party may challenge the outcome of the Due Process hearing by filing suit in a district court of the United States or the appropriate state court. 20 U.S.C. § 1415(i)(2).

Against the backdrop of this remedial scheme, the Court turns to C.B.'s case.

### B. Factual History[1]

C.B. was born in February 2005. P. Ex. 3-7. His family moved to Montgomery County, Maryland, in June 2012, just prior to his first-grade year. P. Ex. 1-4. By this time, C.B. had been diagnosed with Attention Deficit/Hyperactivity Disorder ("ADHD"), Combined Type and Developmental Dyslexia, with additional difficulties in fine and visual motor coordination. P. Ex. 2-12. C.B. possesses higher than average intelligence with a lower than average processing speed. *Id.*

During first grade, C.B.'s IEP provided him with one hour of in-class special education and two hours of out-of-class special education. MCPS Ex. 52-24. For instructional and testing accommodations, C.B. was given a human reader or audio recording of selected sections of test; monitoring of test response; graphic organizers; extended time; multiple or frequent breaks; and reduced distractions to the student and to other students. *Id.* at 11–13. C.B. was also given a variety of supplementary aids, services, program modifications and supports[2] to assist C.B. in working independently, organization, proofreading, following directions, and writing. *Id.* at 14–

---

[1] Factual citations are to the underlying administrative record and are also generally consistent with the ALJ's findings of fact. Citations to the record conform to the following format: the Parents' exhibits appear as "P. Ex. __"; MCPS's exhibits as "MCPS Ex. __"; the transcript as "Tr. __"; and the ALJ Decision as "Dec. __."

[2] Supplementary aids are more flexible than instructional and testing accommodations. Tr. 1003.

17.

During his first-grade year, C.B. was reading and writing at grade level. P. Ex. 5-4; MCPS Ex. 52-5. His progress report card reflected that he was proficient in all topics by the end of the year. P. Ex. 6-1.

C.B.'s second-grade IEP similarly provided him with one hour of in-class special education for his writing and attention, and 1.5 hours out-of-class special education for his writing. P. Ex. 7-21. C.B. also received similar instructional and testing accommodations as the previous year. *Id.* at 10–11. For supplementary aids, the IEP added a "flash pass" to take breaks and sensory objects (stress ball, seat cushion, crunchy snacks, etc.) to aid with focus and frustration management. *Id.* at 12–15.

During second grade, C.B. was reading close to a year above grade level and his writing was on grade level when he was provided significant support. P. Ex. 10-4. C.B. met two of his written language objectives in 100% of trials and met the third objective (capitalization) in three of five trials. P. Ex. 9-1. C.B.'s oral language abilities were noted as a strength. P. Ex. 11-2. By the end of the year, C.B.'s progress report card once again showed proficiencies in every topic, exceeded standards in earth and space sciences, and "in progress" for "writing: use of language." P. Ex. 12-1; *see also* MCPS 50-1 (explaining grading system).

C.B.'s third-grade IEP provided an hour of in-class, and 1.5 hours out-of-class, special education for writing. P. Ex. 14-27. The instructional and testing accommodations and supplementary aids remained largely the same. *Id.* at 14–17–22. In third grade, C.B. was noted to be a "very strong reader." P. Ex. 14-7. His oral language was at grade level, and he was noted to be "very bright and social." *Id.* at 6, 9. The state standardized assessments placed C.B. within the district and state averages for reading and writing. MCPS Ex. 46. C.B. was noted to make

sufficient progress to meet his written language goals, although it is not indicated that he actually met the goals. P. Ex. 14-26. His progress report card showed proficiency across all topics, with areas where C.B. exceeded the standard expectations. P. Ex. 17-1.

C.B.'s fourth-grade IEP—his final year at MCPS —provided 2.5 hours of in-class special education for written expression, mathematics, attention/task completion, and organization, as well as 1.5 hours out-of-class special education for writing. P. Ex. 23-32. The IEP also provided for a variety of instructional and testing accommodations and supplementary aids to include use of visual cues and organizers, breaks, organizational aids, and preferential seating. *Id.* at 19–22.

In fourth-grade, C.B. continued to read above grade level, exhibiting strengths in reading accurately and fluently, and in oral comprehension. P. Ex. 23-8. C.B.'s oral language skills were on grade level as were his written language skills, with accommodations. *Id.* at 7–8. Throughout the year, C.B. made sufficient progress to meet all goals. MCPS Ex. 44-8–16. By the end of the year, C.B. exceeded standards for music and was proficient in all other classroom topics, except that he was "in progress" for reading literature, informative/explanatory writing, and writing process, production, and research. MCPS Ex. 43-3. In the state standardized assessment, C.B. met expectations for reading, but was below expectations in writing. MCPS Ex. 46-5.

C.B. was also noted to be bright and social, as well as compliant with redirection. P. Ex. 23-10; MCPS Ex. 8-5. However, in the fall of C.B.'s fourth-grade year, Dr. Eileen Solomon noted that C.B. was experiencing clinically significant anxiety. P. 25-30. His anxiety centered on his ability to perform work well. Tr. 303. Dr. Solomon concluded that C.B.'s anxiety followed, or was "secondary to," his learning difficulties. *Id.*

The proposed IEP for C.B.'s fifth-grade year provided four hours of weekly in-class

5

special education for written expression, mathematics, attention/task completion, organization, and fluency. P. Ex 36-37. The IEP also provided 1.5 hours weekly out-of-class special education for writing and added counseling time 40 minutes per month to address C.B.'s anxiety. *Id.* The IEP also maintained the same instructional and testing accommodations as the previous year, *id.* at 14–19, and added a variety of supplementary aids, to include an editing checklist, sensory breaks, a daily schedule, and menu of coping strategies. *Id.* at 20–25. This IEP included an additional goal of enhancing C.B.'s reading abilities. *Id.* at 34.

In light of C.B.'s slower progress and his increased anxiety during the fourth-grade year, C.B.'s parents grew concerned that the MCPS IEP did not provide C.B. a FAPE. Consequently, the Parents enrolled C.B. at the Lab School of Washington. MCPS Ex. 21. The Lab School's assessments determined that, contrary to MCPS' findings, C.B. was reading and writing below grade level. P. Ex. 40-2.

MCPS developed a "split" IEP to address the end of fifth grade and C.B.'s first year of sixth grade, considered to be middle school. Tr. 1280. This IEP provided 3.5 hours weekly of in-class special education for written expression, mathematics, attention, and task completion; 3 hours weekly out-of-class special education for writing and reading fluency; and 40 minutes monthly for counseling, all for the end of C.B.'s fifth grade year. P. Ex. 47-44. The IEP also included a variety of instructional and testing accommodations and supplementary aids, such as visual cues, breaks, sensory tools, and a menu of coping strategies, as well as a reading goal. *Id.* at 18–30, 43.

In sixth grade at the Lab School, C.B. was reading on grade level, but his written language remained below grade level. P. Ex. 50-2. The MCPS IEP for sixth grade significantly increased the total number of special education hours: 19 hours and 35 minutes weekly inside

6

general education for digital literacy, English, mathematics, science, and social studies; 3 hours and 55 minutes weekly outside general education; and 20 minutes monthly for counseling. P. Ex. 51-44. These services were available to C.B. for the entirety of the class period, even when he did not require direct support. P. Ex. 64-1. This is because in middle school, writing intersects with many different content areas such that the school cannot determine when precisely the student will need services. Tr. 1238. This proposed IEP included the same instructional and testing accommodations and supplementary aids as the IEP for the end of C.B.'s fifth grade year. P. Ex. 51-18–30. This IEP also included a reading goal. *Id.* at 42.

For both C.B.'s fifth and sixth grade years, the parents rejected the MCPS IEP and kept him at the Lab School.

### C. Procedural History

In July 2017, the Parents filed a Due Process Complaint against MCPS, seeking reimbursement for the costs of placing C.B. at the Lab School for C.B.'s fifth- and sixth-grade years. P. Ex. 1. MCPS opposed, arguing that its proposed placements at Darnestown Elementary School and Lakelands Park Middle School under the proposed IEPs provided C.B. a FAPE. The assigned Administrative Law Judge ("ALJ") held a seven-day Due Process hearing during which eleven witnesses testified and 135 exhibits were introduced into the record.

On February 15, 2018, the ALJ found in favor of MCPS and denied the Parents' request for tuition reimbursement. The ALJ determined that MCPS provided C.B. a FAPE, and so did not reach the question of whether placement at the Lab School was proper. Pursuant to the IDEA, the Parents appealed the ALJ's Decision to this Court on June 15, 2018. ECF No. 1. The parties then filed cross motions for summary judgment in this Court. ECF Nos. 17–18.

## II. Standard of Review

At the Due Process Hearing, the party challenging the student's placement bears the burden of proving by a preponderance of the evidence its respective position as to provision of a FAPE. Both parties are permitted to call witnesses and introduce evidence. At the conclusion of the hearing, the ALJ renders findings of fact and law.

This Court conducts a "modified de novo review" of the ALJ's determination, giving "'due weight' to the underlying administrative proceedings." *MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 530–31 (4th Cir. 2002); *see also T.B., Jr. ex rel. T.B., Sr. v. Prince George's Cty. Bd. of Educ.*, No. 17-1877, 2018 WL 3579681, *6 (4th Cir. 2018); *Wagner v. Bd. of Educ. of Montgomery Cty.*, 340 F. Supp. 2d 603, 611 (D. Md. 2004). This Court must consider findings of fact "made in a regular manner and [with] evidentiary support" to be presumptively correct. *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). To the extent that this Court deviates from the ALJ's findings of fact, the Court must explain its reasons for doing so. *Id.*

Having accorded the ALJ's findings of fact such weight, the Court is then "free to decide the case on the preponderance of the evidence." *Doyle*, 953 F.2d at 105. The Court may, for example, "believe[ ] that the evidence considered as a whole point[s] to a different legal conclusion," despite having accepted the factual findings of the ALJ. *See Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011). In making its determination, however, this Court must not substitute her "own notions of sound educational policy for those of the school authorities." *Hartmann ex rel. Hartmann v. Loudoun Cty. Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir. 1997) (quoting *Rowley*, 458 U.S. at 206). Pure questions of law are reviewed de novo. *See E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 514 (4th

Cir. 2014). Further, Plaintiffs—here C.B. and his parents—bear the burden of proof in this Court as the party seeking relief. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

On a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party to determine whether any disputed issue of material fact precludes entering judgment in the movant's favor as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "Where, as here, cross motions for summary judgment are filed, a court must 'evaluate each party's motion on its own merits, taking care [in each instance] to draw all reasonable inferences against the party whose motion is under consideration.'" *Snyder ex rel. Snyder v. Montgomery Cty. Pub. Sch.*, No. DKC 2008-1757, 2009 WL 3246579, at *5 (D. Md. Sept. 29, 2009) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

### III. Analysis

The Parents contend that the ALJ erred in concluding that MCPS provided C.B. with a FAPE and consequently denying tuition reimbursement for C.B.'s unilateral placement in the Lab School. More particularly, the Parents take issue with the ALJ's crediting MCPS' experts, his findings of fact regarding the provision of certain special education services, the overall determination that the MCPS IEPs provided a FAPE, and that MCPS's placement of C.B. for sixth grade was not predetermined. The Court addresses each argument in turn.

## A. ALJ's Factual Determinations

### 1. Witness Credibility Determinations

As a preliminary matter, the Court notes that an "IDEA hearing officer is not required to offer a detailed explanation of his or her credibility assessments." *S.A. v. Weast*, 898 F. Supp. 2d 869, 877–78 (D. Md. 2012). An ALJ's findings are "regularly made" when "they are reached through a process that is [within] the accepted norm of a fact-finding process." *J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va*, 516 F.3d 254, 259 (4th Cir. 2008). Thus, the Court must defer to the ALJ's factual determinations when, after an evidentiary hearing, the officer resolves the factual disputes "in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *Id.*; *see also Doyle,* 953 F.2d at 104 (holding that a reviewing court should generally not "reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility") (internal citation omitted). Although an ALJ, like this Court, may not "substitute [her] own notions of sound educational policy for those of the school authorities which [she] review[s]," "[a] reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 137 S. Ct. at 1001–02.

The Parents take particular umbrage that the ALJ credited MCPS' expert witnesses, arguing that the Parents' experts should have been afforded more weight because they had more firsthand experience with C.B.[3] However, the ALJ was well within his authority to credit MCPS's experts who grounded their opinions in having observed C.B., as well as their review of evaluations and information from C.B.'s teachers. Tr. 983, 1313, 1578. Indeed, MCPS' expert

---

[3] The Court notes that the all the witnesses who testified at the hearing, except for C.B.'s mother, were offered and accepted as expert witnesses in their respective fields.

in elementary education, curriculum, and instruction, Erin Smeller, was C.B.'s fourth-grade teacher. Tr. 1445–46. By contrast, the Parents marshal nothing in the record to show the MCPS witnesses' opinions were baseless or incredible. On this record, the Court cannot find that the ALJ's determinations were irregularly made.

In support of their position, the Parents highlight Smeller's testimony in which she acknowledges that C.B. struggled with anxiety and attentional deficits. ECF No. 17 at 39. The Court is baffled as to how Smeller's *agreement* with the Parents' experts regarding the nature of C.B.'s afflictions supports reversal. In reality, the Parents object to her ultimate determination that C.B.'s educational needs could be met at MCPS, including his anxiety and attentional difficulties. Tr. 1480–81. The ALJ is entitled to give Smeller's opinion its due weight, and mere disagreement with that determination does not mean the ALJs findings are irregularly made. The Court rejects the Parents' arguments and accords the ALJ's credibility findings appropriate deference.

### 2. Progress at MCPS

The Parents next argue that the ALJ erred in finding that C.B. made progress at MCPS as required under *Endrew F*. *See* Dec. 18. It is undisputed that IEP goals should be reasonably attainable within one year. Tr. 1218, 1133, 1495–96. The record reflects that C.B. met three goals in four years. According to the Parents, C.B.'s IEP goals remained the same each year, reflecting his overall lack of progress. ECF No. 17 at 35. However, MCPS witnesses explained that even though the verbiage describing C.B.'s educational goals remained the same, the goals themselves encompassed the increasingly demanding objectives inherent with each progressive grade level. Tr. 1135, 1501. In this regard, C.B.'s assessments reflected sufficient progress and proficiency at each grade level, supporting the ALJ's finding that C.B. made progress overall.

*See S.T. ex rel. S.J.P.T. v. Howard Cty. Pub. Sch. Sys.*, No. JFM-14-00701, 2015 WL 72233, at *3 (D. Md. Jan. 5, 2015), *aff'd sub nom. S.T. v. Howard Cty. Pub. Sch. Sys.*, 627 F. App'x 255 (4th Cir. 2016).

As for C.B.'s progress in reading, the ALJ credited MCPS' expert testimony, corroborated in part by the Parents' own expert. Dec. 49. Although the Parents now argue that C.B. had weaknesses in his ability to decode words, the Parents' expert, Lab School educator Kim Brown, testified that C.B. had no decoding issues during and after fall 2016. Tr. 642; *see also* P. Ex. 52-1–2. The ALJ's credibility determination, therefore, is supported by the record. *R.F. v. Cecil Cty. Pub. Sch.*, No. ADC-17-2203, 2018 WL 3079700, at *9 (D. Md. June 21, 2018), *aff'd* 919 F.3d 237 (4th Cir. 2019).

Other aspects of the record amply support the ALJ's determination that C.B. made progress in reading while at MCPS. The Woodcock-Johnson IV test reflected C.B.'s advancement in letter/word identification, reading comprehension, and pseudoword decoding. Tr. 1097–102. Testing administered by Lisa Taylor also corroborated C.B.'s ability to decode real words with 94% accuracy. Dec. 49; P. Ex. 21-4.[4] That the ALJ did not mention C.B.'s performance on other standardized tests does not render his findings irregularly made. An ALJ is simply not required to address in point-counterpoint fashion every test score offered into evidence. *See J.P.*, 516 F.3d at 262 ("[T]he level of detail required of a hearing officer is relatively low."). Again, the record reflects no basis to upset the ALJ's findings in this regard.

The Court also concludes, contrary to the Parent's position, that certain minor discrepancies in the ALJ's decision do not merit reversal. Although the ALJ found that Dr.

---

[4] As for Lisa Taylor, C.B.'s private tutor for his fourth-grade year, the ALJ was entitled to credit C.B.'s progress that year to MCPS rather than Taylor when considering that C.B. had progressed educationally at MCPS, before Taylor's involvement. *See* Tr. 237. The Court cannot conclude that these findings are irregularly made. *See MM*, 303 F.3d at 532 & n.13.

Eileen Solomon concluded C.B. had "deficits in decoding" that are rare in children C.B.'s age, Dec. 49, Solomon in fact had found that the discrepancy between C.B.'s high performance in the visual-spatial index and his slowness in processing speed was the rarity. Tr. 297; *see also* Tr. 350 (Dr. Solomon noting that decoding became an area of strength for C.B.). This error, however, pales in comparison to the record evidence on which the ALJ accurately relied. This Court finds that the ALJ's factual determinations were regularly made. *A.H. v. Smith*, 367 F. Supp. 3d 387, 415 (2019).

### 3. Speech and Occupational Therapy

The Parents next contend that the ALJ erred in finding that C.B. did not need speech and language or occupational therapy. Although some evidence reflects that C.B. struggled with verbal expression, Tr. 1531, the record also demonstrates that oral communication was a "strength" for C.B. MCPS Ex. 48-1, 49-1. C.B.'s scores on standardized testing for expressive vocabulary, language memory, and metalinguistics all were within expected ranges, with only a slight—but not significant—weakness in narrative language and weakness in following directions. Tr. 1580–83; P. Ex. 35-5–9. Additionally, the record evidence reflects that C.B.'s oral communication was sufficient to support learning in the classroom. P. Ex. 45-2. The Parents' disagreement with the ALJ's determinations alone does not amount to an "irregularity" in fact-finding that warrants reversal.

C.B. next challenges the ALJ's crediting MCPS' conclusion that C.B. did not need occupational therapy. MCPS' occupational therapist-expert, Lynn Tozzi, opined that while the evaluation administered to C.B. reflected that he could benefit from occupational therapy, the test was not determinative of C.B.'s ultimate needs in an educational environment. Tozzi pointed out that the test was designed to assess the needs of children between the ages of five and

13

ten, and C.B. was eleven when he was tested. P. Ex. 42-2. Tozzi further explained that the evaluation "can yield insights into a child's sensory processing patterns in the home setting, [but] it does not always translate to a school setting." *Id.* The ALJ credited Tozzi's opinion and this Court sees no basis in the record to upend that finding. This is especially so where other record evidence demonstrates C.B.'s fine and gross motor skills sufficiently developed in that he participated in and enjoyed wood workshop, art, and sports. Tr. 634–35 (describing C.B.'s use of tools, pencils, charcoal, and paint brushes), 836–38 (describing C.B.'s enjoyment of cooking, climbing trees, playing lacrosse, and building small remote-control cars). Indeed, even the Parents, through counsel, agreed that by sixth grade, C.B. did not need occupational therapy services moving forward. MCPS Ex. 37-59. The ALJ's finding is well-supported.

### B. FAPE at MCPS

The Parents next challenge the ALJ's conclusion that the fifth- and sixth-grade MCPS IEPs provided C.B. with a FAPE. A FAPE generally requires "an IEP reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Endrew F.*, 137 S. Ct. at 996 (quoting *Rowley*, 458 U.S. at 204) (internal quotation marks omitted). During his four years at MCPS, C.B. scored "proficient" in the majority of subjects. Likewise, for most of his time at MCPS, C.B. was performing (with supports) on-grade level in writing and reading, and he continued to advance through each grade. C.B.'s actual progress suggests that the fifth- and sixth-grade IEPs, which provided additional supports from C.B.'s previous years, were reasonably calculated to enable C.B. to achieve educational benefits. *See M.S. ex rel. Simchick v. Fairfax Cty. Sch. Bd.*, 553 F.3d 315, 326 (4th Cir. 2009).

C.B.'s primary contention is that the MCPS IEPs did not address adequately his anxiety and applied the wrong legal standard in determining that C.B.'s emotional condition was not "so

14

severe that he was unable to function at school." Dec. 54. The record, however, amply supports that the MCPS IEPs addressed C.B.'s anxiety in a manner that was reasonably calculated to allow C.B. access to the curriculum. In the fifth-grade IEPs, C.B. was provided forty minutes of counseling per month, and in sixth-grade, twenty minutes of counseling per month. The IEPs also provided visual cues to C.B. to redirect him without making him feel singled out; visual organizers[5] and daily schedules to help C.B.'s anxiety about what steps come next; breaks to allow C.B. to decompress and reset; must-do's and may-do's to help C.B.'s anxiety about the amount of homework that he has; and a menu of coping strategies for his anxiety. Tr. 999–1008. Further, the record demonstrates that in fourth grade, despite C.B.'s frustration and anxiety surrounding certain assignments, Tr. 52–54, he made sufficient educational progress to "demonstrate understanding of the concepts being taught." MCPS Ex. 8-5. The Court cannot conclude that the ALJ's determination as to adequate accommodations for C.B.'s anxiety was factually unsupported.

    The Parents next argue that C.B. was denied a FAPE because the IEPs lacked in sufficient specialized instruction. Dr. Solomon explained that C.B. needed one-to-one guidance and support to complete certain tasks. P. Ex. 25-27. The Parents' expert further opined that C.B. would likely have difficulty in a class of 20 or 25 students. Tr. 620. However, Smeller, as C.B.'s fourth-grade teacher and an expert in elementary education, curriculum, and instruction, testified that C.B. accessed the general education curriculum and progressed academically in a class size of 25 students. Tr. 1480–81. The ALJ's finding that C.B. accessed that general education environment constitutes an implicit credibility determination as to Smeller, to which the Court defers. *See S.A.*, 898 F. Supp. 2d at 874–75.

---

[5] The IEPs that covered the end of C.B.'s fifth-grade year and his sixth-grade year did not include visual organizers but did include graphic organizers. P. Ex. 47-20.

Altogether, MCPS provided C.B. with an educational plan that was appropriately ambitious for C.B. *See Endrew F.*, 137 S.Ct. at 1000. The IEPs provided enough support to allow C.B. to access a general education curriculum and allow him to participate, to the extent possible, in the same activities as children without disabilities. *See MM*, 303 F.3d at 526. The ALJ did not err in finding that the IEPs provided C.B. with a FAPE.

### C. Predetermination

Finally, the Parents contend that C.B.'s placement at Lakelands Park Middle School ("Lakelands") was predetermined. Predetermination of an IEP is a procedural error and violates the IDEA only if the child did not receive a FAPE because of the predetermination. *E.S. ex rel. B.S. v. Smith*, 767 F. App'x 538, 539 (4th Cir. 2019). The Court has already affirmed the ALJ's conclusion that the MCPS IEP provided C.B. a FAPE. Accordingly, because no violation of the IDEA occurred, the predetermination argument must fail.

Alternatively, even if the question of predetermination was before this Court, it would affirm the ALJ's finding that MCPS did not predetermine C.B.'s IEP. MCPS witnesses testified that it proposed Lakelands because it was C.B.'s homeschool and that it could provide sufficient support to C.B. *Id.* at 1052, 1060. The ALJ credited this evidence. Dec. 58.

The Parents argue in response that the only reason the MCPS IEP increased C.B.'s service hours in sixth grade is because "that's how Lakelands Park Middle School does it." Tr. 1665. This contention falls flat in light of the record evidence reflecting that increased service hours are responsive to the integration of skills, such as writing, into all core content areas customary in middle school curricula nationwide, making it difficult to plan in advance when a student will need support. *Id.* at 1238. MCPS therefore increased service hours to ensure availability of the support throughout those core content classes, even though the student may

16

not need to use all hours allotted. *Id.* at 1238, 1250. In determining the supports C.B. would need across these classes, MCPS witnesses testified that the recommendation addressed C.B.'s individualized needs. *Id.* at 1060. The ALJ credited this rationale. Dec. 58. The ALJ resolved the competing factual narratives properly, and C.B. has pointed to no evidence demonstrating the contrary. The record further reflects the Parents' opportunity to participate in the decision-making process, and so no basis exists to upset the ALJ's decision. *See also M.C.E. ex rel. T.Q.A. v. Bd. of Educ. of Frederick Cty.*, No. RDB-09-3365, 2011 WL 2709196, at *8 (D. Md. July 11, 2011) ("Predetermination is not synonymous with preparation.") (quoting *Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006)) (internal marks omitted). The Parents are not entitled to summary judgment on this ground.

## IV. Conclusion

Because the Court finds that the ALJ's determinations are properly supported, the Parents' motion for summary judgment is denied and MCPS's motion is granted. A separate Order follows.

7/09/2019  
Date

/S/  
Paula Xinis  
United States District Judge

17